DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division, which terminated appellant's parental rights. Because we conclude that the trial court's findings were not supported by the evidence presented, we reverse.
 {¶ 2} Appellant, Thomas G., is the biological father of three children, Heaven, born August 8, 1997; Brianna, born September 6, 1999; and Faith, born February 27, *Page 2 
2003.[1] On February 19, 2004, the children began officially residing with the paternal grandmother, Paula G., pursuant to a Lucas County Children Services ("LCCS") safety plan which addressed concerns that mother, Amanda B., had failed to properly supervise the children. Under the plan, grandmother was to supervise any contact between the children and mother. The safety plan did not list any concerns regarding appellant, who was also living with grandmother at that time, but stated that grandmother was to contact the agency if mother tried to remove the children.
 {¶ 3} On March 3, 2004, LCCS filed a complaint in dependency and neglect regarding the three children. Among the allegations in the complaint, LCCS alleged that mother and appellant, who were married, had a "history of domestic violence," that the parents had substance abuse issues, that mother's housekeeping was poor, and that the children had chronic head lice. The complaint further alleged that, on March 4, 2004, mother tested positive for cocaine and appellant tested positive for cocaine and another substance.
 {¶ 4} On May 11, 2004, the trial court adjudicated the children to be dependent and neglected and awarded temporary custody to LCCS. Over the next year, case plans were filed, recommending that the parents participate in various services and complete certain assessments. Mother did not participate in or complete any services. By April 2005, however, appellant had completed parenting classes, a domestic violence program, *Page 3 
and the "Philio" substance abuse treatment program. As part of his substance abuse treatment, appellant also began attending AA meetings and obtained an AA sponsor. Appellant also consistently attended weekly visitations with the children.
 {¶ 5} In June 2005, at a case plan review, LCCS requested that appellant complete a psychological evaluation. This new requirement was allegedly added due to the discovery in March 2005 of a 1988-89 juvenile court delinquency adjudication on the basis of gross sexual imposition which occurred when appellant was 15 years old.
 {¶ 6} On October 27, 2005, LCCS filed a motion for permanent custody. The dispositional hearing was held on May 2, 2006 and July 28, 2006. The following is a summary of relevant testimony and witnesses. At the outset of the hearing, without conceding that it was in the best interest for LCCS to take permanent custody, appellant stipulated to the following allegations in the permanent custody motion, as amended: that the children had been adjudged dependent and neglected on April 14, 2004, that temporary custody was awarded to LCCS, and that the court approved case plan filed on March 24, 2004 sought reunification as the goal. Appellant further stipulated that he completed a diagnostic assessment at Unison, and that he "began the Domestic Violence offender group in October of 2004 and completed the program in April 2005." Appellant also stipulated to the occurrence of a "recent incident in June of 2005 between Tom and Amanda in which Amanda reported that she was raped by Tom. July 2005, Tom was charged with assault and a warrant for his arrest was issued." *Page 4 
 {¶ 7} Appellant also stipulated that he completed "treatment at Philio in 2/05, but relapsed and did not re-engage in treatment. At the semi-annual review held on June 13, 2005, appellant was unable to provide slips verifying he attended 12 step meetings. The caseworker has not heard from appellant since June 13, 2005 and his current whereabouts are unknown." Appellant then stipulated to the following:
 {¶ 8} "Both parents were to acquire and maintain stable housing. Thomas had been residing with his mother, but his current whereabouts are unknown, and his mother had told the caseworker that she does not know where he is. Tom's employer failed to verify he was working there at the time the caseworker contacted them in July 2005."
 {¶ 9} Finally, appellant stipulated that he had been visiting the children weekly at LCCS, but had not visited since the warrant was issued for his arrest, and that he had completed the Parenting Plus group at Unison in February 2005. The state then presented the following testimony and evidence.
 {¶ 10} Lori Wilson, LCCS caseworker, testified that appellant had, in fact, completed case plan services by April 2005. She stated that in March 2005, the agency discovered that appellant had "sexual offender issues" that occurred in 1988 and 1989 when appellant was 15 years old. Other than mother's rape accusations, however, which were not prosecuted, appellant had no other sexual crime allegations since the juvenile case. Wilson stated that appellant had been reassessed after he "relapsed" and used alcohol in June 2005, but that he did not go back to the program at Philio or New *Page 5 
Concepts. She noted that he had "worked well with me" and knew what he had to do to complete case plan services.
 {¶ 11} After the incident with mother in June 2005, Wilson recommended that appellant contact Unison to address the domestic violence incident. She did not know, however, if appellant ever contacted Unison or other service providers. She also stated that appellant did not complete the psychological evaluation in relation to the juvenile sexual offender issues. Despite appellant's stipulation, Wilson confirmed that LCCS log records indicated that appellant had visited the children after the warrant was issued. He visited on July 13, 2005, and again on July 20, 2005, but left because police were called to arrest him on the basis of the warrant that had been issued. The log book then shows an approximate two month gap, but that appellant again began visiting regularly on September 28, 2005.
 {¶ 12} Wilson stated that the agency decided to pursue permanent custody of the three children on August 1, 2005. She later conceded, however, that the decision was most likely made right after the June 2005 staffing. She stated that although appellant had completed his case plan services, the agency decided to pursue permanent custody because of appellant's failure to address the adolescent sex offender history, his "relapse" regarding alcohol use, and agency concerns about the alleged assault against mother. Wilson acknowledged, however, that mother was not always truthful and that it was possible she was lying about the rape and assault allegations. She also noted that mother sometimes had bruises which she reported were caused by abuse by her then current *Page 6 
boyfriend. Wilson said that she became a supervisor in August 2005, and did not have direct contact with appellant after that time.
 {¶ 13} Lindsay Dierkens, appellant's LCCS caseworker since August 2005, testified that appellant was reassessed for substance abuse issues, but had not participated in services. She also stated that appellant had not attended the domestic violence program again or completed a psychological evaluation. Dierkens confirmed, however, that appellant had maintained visitations since September 2005, even though the visits were restricted to being supervised at the agency. She also confirmed that he had been employed in the same place since at least September 2005. She stated that appellant said he had called Unison, but received no return call or was unable to reach the person needed. Dierkens had not called Unison to follow up or confirm that information, but, to her knowledge, appellant was not in treatment at Unison at that time.
 {¶ 14} Dierkens stated that she reminded appellant monthly of the recommendations made by Wilson before she became a supervisor. She stated that she herself never made any specific recommendations to or had discussions as to treatment with appellant, but relied solely on whatever Wilson had told him prior to August 2005. Dierkens also noted that although appellant completed the reassessment for substance abuse treatment, he had not engaged in the recommended treatment. At one point, appellant had told the caseworker that the assessment worker, Michelle Smith, had told him he did not need treatment because a one-time occurrence did not constitute a true *Page 7 
relapse. Dierkens stated that Smith had told her something different. She did not know whether appellant had an AA sponsor.
 {¶ 15} Dierkens also stated that she did not do any follow up regarding the rape/assault allegations because she did not have any indication as to whether the allegations were true. She acknowledged, however, that although appellant had done well on services up until June 2005, mother's allegations were likely the basis for the agency's decision to seek permanent custody.
 {¶ 16} Dierkens also stated that, despite file references to treatment, she knew nothing about any counseling or services to the children prior to her being placed on the case in August 2005. She noted, however, that, since the children, including Heaven, were not currently in counseling, she presumed that it was no longer needed. The agency then rested.
 {¶ 17} Paternal grandmother, Paula G., then testified that the children had been placed with her and her husband in February 2004, under a safety plan which prohibited unsupervised contact with mother. She testified that one day when she returned home from work, Heaven had said mother had been dropped off at the house and was "beating up her dad." Grandmother called to report the incident to CSB, as required under the safety plan. A safety plan dated February 25, 2004, stated that appellant agreed not to supervise contact between mother and the children.
 {¶ 18} Grandmother also stated that, at LCCS' request, her younger son moved out of her home because of alleged "indications" of sexual abuse against his sister's step *Page 8 
daughter and another child. Since her younger son was no longer living with her, grandmother stated that she had no idea why the children were later removed from placement with her on March 2, 2004. She stated that Lori Wilson told her she would never get custody, however, because of the issues with her younger son, even though no actions had ever been taken. Grandmother stated that charges were never brought against her younger son because the two girls had admitted they lied. She stated that, although she did not believe her younger son had ever molested the two girls, she would protect her grandchildren and report anything if she ever thought they were being harmed by anyone.
 {¶ 19} Grandmother stated that her current residence has four bedrooms. She said that appellant had been employed at the same place for almost two years and sometimes worked six days a week. She said he was working on "rehabbing" a house provided by his boss and had said the home would be ready within a month. Grandmother denied that appellant was "missing" during July and August 2005. She stated that she told Lori Wilson that he was not at home when the caseworker contacted her in summer 2005. She said that she then called appellant at work, who said he had called Lori and left a message on her machine.
 {¶ 20} The hearing was then continued to July 28, 2006. Ray Paker, appellant's AA sponsor, testified that he had known appellant from infancy. Paker stated that he had been appellant's sponsor since February 2005. Paker testified that, with only a few exceptions when he himself has been out of town, he had been in contact with appellant *Page 9 
from once to three times per week. He confirmed that appellant had been attending AA meetings, noting that some meetings do not provide attendance slips. He stated that appellant had told him about the relapse and that it had involved contact with mother. Paker had also advised appellant that the relationship with mother was not healthy and urged him to end it.
 {¶ 21} Since the relapse, Paker believed that appellant has continued to be sober because his attitude and demeanor was different when he was drinking. Paker opined that appellant is successfully in recovery, with the caveat that AA believes in the "one day at a time" motto. He stated that no one can ever predict what will happen in the future, but that appellant was currently working on the fourth step of the twelve steps of recovery. He also acknowledged that there had been a gap in communication with appellant for about a month and a half when appellant had become briefly re-involved with mother.
 {¶ 22} Appellant's sister, Junill W., testified that mother, appellant, and their children had lived with her in 2001 and 2002 for approximately six months. She said that the couple often fought, with mother as the aggressor who would strike appellant in the head with her fist. Junill said that she had seen appellant push mother away during these altercations, but she had never seen him hit her back. Junill also believed that mother was not a truthful person because she had stolen Junill's checkbook and money from that account while living with her. Junill also did not believe appellant currently had a *Page 10 
drinking issue, but thought he could continue attending AA meetings to prevent such a problem from arising.
 {¶ 23} Junill testified that she observed the incident in June 2005 between mother and appellant. Appellant had come to Junill's house to visit friends in the neighborhood. Junill said that mother and her boyfriend came out of a house across the street. When mother saw appellant, she screamed at him and hit him in the head with a beer bottle, later claiming to police and her boyfriend that appellant was "touching on her." According to Junill, who observed the entire incident, mother's claims were completely false.
 {¶ 24} Junill stated that appellant had no longer had any contact with mother since the June 2005 incident. Junill also attended some of the visitations at LCCS and said that appellant had interacted very appropriately with the children who were always happy and eager to see him, hanging on him and giving him hugs. She also agreed that Heaven had a lice problem during the 2003-2004 school year. According to Junill, Heaven had been infected in school, and had then infected the other two children at home. She said that, despite properly using lice medication and following instructions to vacuum, wash bedding, and discard stuffed animals, the problem would stop only to restart again.
 {¶ 25} Junill also explained the circumstances surrounding the sexual molestation allegations involving her younger brother. She stated that, based on statements made by her two stepdaughters, she took them to the prosecutor's office to press charges against her brother. After talking with the children seven separate times, however, the prosecutor *Page 11 
did not pursue any charges because the girls' stories changed every time, indicating untruth. She stated that LCCS was never involved and never came to talk to her or her children about the incident. Moreover, Junill was not aware of any investigation by LCCS which indicated a finding of sexual abuse by her younger brother with respect to her stepdaughters and niece.
 {¶ 26} Finally, appellant testified regarding the services he had completed and efforts made to comply with the case plan. He stated that he had completed parenting classes, domestic violence group, and substance abuse treatment by April 2005. Appellant stated that he had not provided AA attendance slips for all his meetings at the June 5, 2005 staffing because he was no longer required to get slips after he completed the Philio program several months before. He admitted that he used marijuana in the past but that was before he had children. He stated that he had done drug screens for LCCS and that he had never tested positive.
 {¶ 27} Appellant stated that the June 2005 incident with mother had occurred because he had wanted to try to work things out in that relationship. He stated that he had gone to visit friends at a home near his sister's residence. Appellant stated that when he pulled up in his car, mother tried to get other people to "jump" him. Appellant said that he and mother started arguing and she hit him in the back of the head with a beer bottle. He said he responded and hit her in the back of the head, but then left. Although mother had claimed rape, appellant was ultimately charged with assault and a warrant was issued in July 2005. *Page 12 
 {¶ 28} Appellant acknowledged that he had stopped visitations with the children from July 19, 2005 to September 2005, fearing that he would be arrested on the assault warrant. He stated that he grew tired of not seeing his children and went to a visitation in September despite the warrant. He was arrested, but the charges were dismissed.
 {¶ 29} Appellant said that the last time he had consumed an alcoholic beverage was during his "relapse" in June 2005 when he had three beers on mother's birthday. He stated that he considered going to AA to be treatment for his relapse. Appellant attended AA meetings weekly, talked to his sponsor, and had created a relapse prevention plan to assist him should such a situation again arise. After his re-assessment at Philio, appellant recalled that the assessment person, Michelle, had said that a single relapse incident would not necessarily require taking the substance abuse class again, as far as she was concerned, but that she needed to check it with her supervisor. He stated that although he was ultimately advised to re-engage in treatment, the assessment persons at Philio were unaware that he was still attending AA meetings and working that program. Appellant also stated that although he did not believe he had a true "relapse" because he did not have a change of mind or attitude about the use of alcohol. Despite his belief that he no longer had an alcohol problem, however, he had attended the program at Philio and AA meetings so that he would be in compliance with his case plan and be reunified with his children.
 {¶ 30} Appellant stated that the case plan required him to have "stable housing," not independent housing. He stated that he believed his mother's home would be *Page 13 
considered stable housing, but that the house he had been working on is still available and would be completed. Appellant said that the agency told him that once he completed the classes, he would get his children back, but that did not happen. He agreed that each time the agency held an administrative review, and he had completed the required classes, the agency told him he had to do something more.
 {¶ 31} Appellant also addressed the juvenile delinquency finding based upon gross sexual imposition. Although Wilson had expressed concern that he had not received treatment, appellant told her that he had completed counseling through the local Children Resource Center. Court records referred to by the guardian ad litem at the hearing confirmed that he was required to complete the adolescent program at that center. Other than the two false allegations by mother, appellant said that he had never had any sexual abuse charges against him since the juvenile case. At the June 2005 agency review, appellant was asked to undergo a psychological evaluation. He stated that he missed one appointment and had not received a return call for rescheduling. Appellant testified that Lori Wilson then told him it was no longer necessary, because he was never getting his children back due to the rape and assault claims by mother. He said that the agency no longer wanted to assist him in getting the evaluation. Appellant was still willing to submit to such an evaluation in order to be reunified with his children.
 {¶ 32} The guardian ad litem referenced her report and then gave a brief statement. She expressed some concern about granting permanent custody in this case where children had been removed from a less advantaged family and placed in a more affluent *Page 14 
foster home. She noted that appellant had completed his case plan, the children cared very much for him and expressed a desire to maintain contact with appellant and their biological family. She said interaction between appellant and his children during visitations was very appropriate. She thought grandmother's current home would be a suitable residence, but also noted that the children had thrived in foster care.
 {¶ 33} The guardian at litem further observed that the foster/potential adoptive parents appeared to have a good relationship with appellant. She believed and hoped that, if permanent custody were granted, that the foster parents would carry out their assurances that they wanted to continue to include appellant and his extended family in the children's lives. Despite appellant's good efforts, the guardian ad litem felt that the children "are just better where they are" and it was in their best interest to remain with the foster parents.
 {¶ 34} The trial court found it to be in the best interest of the three children to grant permanent custody to LCCS, based on various findings under R.C. 2151.414(E). The court also found that the children had been in the temporary custody of the agency for 12 out of consecutive 22 months, pursuant to R.C. 215 1.414(B)(1)(d).
 {¶ 35} Appellant now appeals from that judgment, arguing the following sole assignment of error:
 {¶ 36} "Numerous findings of fact relevant to O.R.C. 2151.414(E) were not supported by clear and convincing evidence and the Trial Court's decision should thus be reversed and vacated." *Page 15 
 {¶ 37} In this case, the trial court found that, under R.C.2151.414(E), the children could not be "placed with either parent within a reasonable period of time or should not be placed with the parents" because LCCS had properly proved the factors under R.C. 2151.414(E)(1), (2), (4), (14) and (16), and R.C. 2151.414(B)(1)(d) as to appellant. He argues that the trial court's findings, as they pertain to him, are not supported by the evidence presented.
 {¶ 38} A parent's rights to conceive and rear his or her child have been "deemed `essential,' Meyer v. Nebraska, 262 U.S. 390, 399,43 S.Ct. 625, 67 L.Ed. 1042 (1923), `basic civil rights of man,' Skinner v.Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), and ` far more precious * * * than property rights.' May v. Anderson,345 U.S. 528, 533, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v.Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)."Stanley v. Illinois (1972), 405 U.S. 645, 651. The inviolability of the parent-child relationship finds protection in the Due Process Clause of the Fourteenth Amendment, Meyer, supra; the Equal Protection Clause of the Fourteen Amendment, Skinner, supra, and Santosky v. Kramer (1982),455 U.S. 745, 753; and the Ninth Amendment, Griswold v. Connecticut
(1965), 381 U.S. 479, 496 (Goldberg, J., concurring).
 {¶ 39} Moreover, "[the] law does not contemplate the taking of children from their parents because they can be better provided for by foster parents or adoptive parents due *Page 16 
to greater affluency." In re Lay (1987), 43 Ohio App.3d 78, 82, citingIn re Konneker (1929), 30 Ohio App. 502, 511. Only where there is a "demonstrated incapacity or something akin to criminal neglect that the law is justified in interfering with the natural relations of parent and child." Konneker, supra, at 511.
 {¶ 40} In Ohio, it has long been held that parents who are suitable persons maintain a paramount right to custody of their minor children.In re Murray (1990), 52 Ohio St.3d 155, 157; In re Perales (1977),52 Ohio St.2d 89, 97; Clark v. Bayer (1877), 32 Ohio St. 299, 310. The state may not award permanent custody of a child absent a predicate finding that the child's natural parents are unsuitable. In rePerales, supra, syllabus.
 {¶ 41} The Ohio General Assembly has defined parental unfitness for a child who is not abandoned or orphaned as a finding that the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C.2151.414(B)(1)(a). To enter such a finding, the court must conclude that the evidence presented clearly and convincingly discloses that the parent in question is unsuitable for one or more of the reasons articulated in R.C. 2151.414(E). In re William S. (1996),75 Ohio St.3d 95, syllabus. Because the right to raise and nurture one's child is so basic, the statutory conditions which defeat that right must be strictly construed. In re Cunningham (1979), 59 Ohio St.2d 100, 105.
 {¶ 42} The first finding challenged by appellant is that, pursuant to a R.C. 2151.414(E)(1), he failed continuously and repeatedly to remedy the problems that *Page 17 
initially caused the children to be placed outside the home, that he failed to utilize the services offered to him to alleviate the conditions that led to the children's removal, and that appellant has failed to change parental conduct which would allow him to resume and maintain parental duties.
 {¶ 43} R.C. 2151 .414(E)(1) provides that, in "determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 44} In this case, the reason for removal of the children from appellant's custody stemmed primarily from the allegations of domestic violence with mother, substance abuse issues, and that the children had chronic head lice. The children's aunt testified that although appellant and grandmother attempted to remedy the head lice problem, the children became re-infected when Heaven returned to the school she was attending. In response to the case plan for services, it is undisputed that appellant successfully completed parenting classes, the domestic violence program, and the substance abuse treatment program, as recommended by LCCS. Although appellant had completed these services by March 2005, the agency did not return the children to him at that time.
 {¶ 45} Instead of implementing actions to return the children to appellant at the completion of his case plan services, however, the agency continued to keep the children in placement until June 2005, when yet another condition was placed on appellant. *Page 18 
Despite the fact that no allegations of sexual abuse had ever been made regarding the children, appellant was now required to undergo a psychological evaluation concerning the juvenile charge that had occurred more than 15 years earlier. According to appellant, however, he did not schedule the evaluation because Wilson had told him that the action would be futile since LCCS would not be returning his children to him under any circumstances. No LCCS testimony was presented to refute this. Rather, neither caseworker had followed up to determine whether appellant had attempted to schedule an appointment. Appellant stated that, even now, he would be willing to undergo the psychological evaluation, in order to effect the return of his children.
 {¶ 46} No evidence of substance abuse was offered by LCCS, except for appellant's own admission that he had had a one-time "relapse" in his alleged alcohol uses in June 2005. This "relapse," which consisted of drinking several beers, was later divulged to his caseworker and his AA sponsor. At LCCS' request, he completed yet another substance abuse assessment, which recommended that he resume "treatment." Appellant acknowledged that he did not go to back to Philio, but stated that he considered his continuing with the AA program to be treatment, which the assessment person did not know he was attending. He stated that he had not had a drink since the June 2005 "relapse" and that the AA program provided him with the support and treatment he needed to remain sober.
 {¶ 47} In our view, under the circumstances of this case, appellant's choice to utilize AA was a valid alternative to returning to the Philio program. He also stated that *Page 19 
although he believed his alcohol substance abuse was no longer an issue, he continued to attend AA meetings in order to prevent problems from recurring. With the exception of the single relapse, no evidence was presented that appellant continued to have problems due to alcohol substance abuse. Appellant testified that, despite the allegations in the permanent custody motion, he had never tested positive for cocaine, and that he had long since stopped using marijuana. No proof of any drug use by appellant was presented. Therefore, the trial court's factual finding that appellant did not engage in services regarding substance abuse, was unsupported by the evidence.
 {¶ 48} Appellant also expressed that from attending the domestic violence program, he now realized that the arguments and fights between him and mother had been detrimental to the children. No evidence was presented that charges involving mother's accusations of rape and assault were pursued. Rather, the unchallenged testimony was that these charges were dismissed. In addition, no further incidents of domestic violence occurred between the time of the June 2005 incident and disposition in July 2006. Furthermore, since no allegations of sexual abuse were ever made pertaining to his children, appellant's failure to undergo the psychological evaluation, especially after LCCS had changed its goal to permanent custody, did not constitute a failure to utilize services "offered" by the agency.
 {¶ 49} Consequently, based upon the evidence presented, the record does not support the trial court's finding that appellant failed to avail himself of the services offered by the agency. No evidence was presented that appellant had been wholly *Page 20 
unsuccessful in addressing the allegations presented in the complaint. Therefore, we cannot say that clear and convincing evidence was presented to show that appellant did not remedy the conditions that prompted the children's removal from the home. Accordingly, the R.C. 215 l.414(E)(1) factor was not established.
 {¶ 50} Appellant also challenges that finding that he has a chronic chemical dependency which is so severe that it prevents him from providing an adequate permanent home. R.C. 2151.414(E)(2) provides that the "chronic * * *chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the [permanent custody hearing] * * *."
 {¶ 51} In this case, the majority of the evidence presented dealt with mother's continued substance abuse issues, her lack of cooperation with or completion of the case plan, and lack of visitation with the children. Mother's ultimate desire, according to the caseworkers, was to abandon the children, but she did not want appellant to have custody. The state submitted two drug test results for mother, one of which showed positive for cocaine on March 5, 2004. As we noted previously, no drug test results were submitted for appellant.
 {¶ 52} Although mother continued to shun services and tested positive for cocaine, no evidence was presented that appellant was using drugs or that his alleged alcoholism was so chronic and severe that it would prohibit him from providing an adequate home. The court found that he "failed to re-engage in services when he relapsed with alcohol *Page 21 
stating that he did not relapse because he did not have a substance abuse problem." Even presuming that the June 2005 usages constituted a "relapse," the records shows that this was the only documented alcohol use, for which appellant continued to seek treatment through AA. As we noted, although appellant did not utilize the exact treatment program recommended by LCCS, the record indicates that he did, in fact, complete his reassessment and then continued in treatment. Furthermore, even presuming that appellant did not re-engage in services recommended by Unison, no evidence was presented that, after June 2005, appellant had continuing issues with either alcohol or drug use. Since the end result was that appellant was not displaying substance abuse problems, the fact that he did not go through the Philio program again is irrelevant. Therefore, again, we conclude that the record does not support the trial court's finding under R.C. 2151.41 4(E)(2) as it pertains to appellant.
 {¶ 53} Appellant also argues that the trial court's finding under R.C. 2151.4 14(E)(4) was not supported by the evidence. That section provides that:
 {¶ 54} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; * * *."
 {¶ 55} In this case, appellant testified that he had been paying child support, which was not refuted. It was undisputed that appellant consistently and regularly visited the children between March 2004 and July 2006, with the exception of a two month period *Page 22 
from mid-July to mid-September. The reason for appellant's absence at that time was his fear of the outstanding arrest warrant relating to mother's allegations. Appellant stated that, despite the warrant, he ultimately wanted to see his children and, was arrested when he attended a visitation. Again, nothing in the record indicates that any charges were pending at the time the permanent custody motion was filed or at the dispositional hearing. Although we realize that a two month gap in visitation is not insignificant, under the circumstances, it did not indicate appellant's disinterest in his children. Rather, he wanted to avoid being arrested on allegations and charges which were later dismissed. In addition, contrary to the trial court's factual finding, appellant's attendance during the two and half year custody period, both before and after the two month interruption was, in fact, consistent and regular.
 {¶ 56} Finally, we can find nothing in the record that shows that appellant was unwilling to provide an adequate home — unable, perhaps, but not unwilling. Inability to provide a home does not satisfy the statutory factor. In re William S. (19960, 75 Ohio St.3d 95, 100. Appellant was living with his mother, the children's grandmother, in a home which was large enough to temporarily accommodate appellant and his children. Caseworkers stated that they had not done a home study on this residence, presumably because the agency goal was permanent custody.
 {¶ 57} Furthermore, appellant stated that he had been working on refurbishing a separate home, which, although not yet finished, would be ready within a short time. Nothing in the case plan required appellant to provide a home separate from his mother's, *Page 23 
but even if it had, nothing in the record shows that appellant was unwilling, only that he needed more time to complete renovations. Therefore, based on our review of the record, the trial court's finding pursuant to R.C. 2151.4 14(E)(4) was not supported by the evidence presented.
 {¶ 58} The trial court also found, under R.C. 2151.414(E)(14), that appellant was "unwilling to provide food, clothing, shelter, and other basic necessities for the children." Again, the record indicates appellant was working full-time, earning approximately $360 per forty-hour work week, and stated he had been paying child support. Again, nothing was presented to show that he was unwilling to provide food, clothing, shelter, or basic necessities. Therefore, we conclude that the record does not support this finding.
 {¶ 59} Under R.C. 2151.414(E)(l6), the court found that the "father's propensity of [sic] domestic violence and refusal to address domestic violence issues would be harmful to the children's development and safety." It is undisputed that appellant successfully completed the domestic violence program by March 2005. It is also undisputed that although an incident occurred between appellant and mother in June 2005, no evidence was presented that the assault charges were pursued by the prosecutor and this incident did not occur in front of the couple's children. In addition, once appellant stopped having contact with mother, no other domestic violence issues occurred after that incident. No testimony was offered to contradict appellant's testimony that he now appreciated the harmful nature of his actions, especially if occurring in front of his children. Nothing in the record shows that he had engaged in such actions with anyone but mother. *Page 24 
Consequently, in light of all the services completed by appellant to address the domestic violence issues, and that only one incident occurred between mother and appellant after the complaint was filed, the trial court's finding that appellant maintained a "propensity for domestic violence" was not supported by the record. Therefore, we conclude that the trial court's finding under R.C. 2151.414(E)(16) that appellant refused to address domestic violence issues, was also unsupported by the testimony or evidence.
 {¶ 60} Finally, the trial court found that, pursuant to R.C.2151.414(B)(1)(d), the children had been in the temporary custody of a public children's services agency for more than 12 months of a 22 consecutive month period. On its face, this finding is correct. Nevertheless, our concern has been and continues to be that R.C.2151.414(B)(l) appears to circumvent the question of parental fitness entirely and to permit termination of parental rights for a child in the temporary custody of a children services agency for 12 or more months out of a consecutive 22 months on a best interests finding only.
 {¶ 61} Since temporary custody is largely a matter of the recommendations and requests of the children services agency itself, this provision appears to circumvent any judicial determination of parental fitness. As we have noted our concern previously, this might raise substantial due process questions were this deemed the sole reason for a termination of parental rights. See Quilloin v. Walcott (1977), 434 U.S. 246,255; Smith v. Organization of Foster Families (1977),431 U.S. 816, 862-863. Therefore, we must determine whether the time period for this finding was created by appellant's lack of *Page 25 
cooperation and inability to complete services or the case plan in a timely manner, or whether the time period was artificially extended in order to meet the statutory factor.
 {¶ 62} In March 2005, when appellant had completed his services, the children had been in temporary custody for 12 months out of the previous 12 month period. No actions were taken by LCCS, however, to begin returning custody of the children to appellant.
 {¶ 63} In June 2005, LCCS requested appellant to complete yet another requirement, to undergo a psychological evaluation concerning the 16 year old juvenile charge. The alleged assault claim by mother then created logistic problems for appellant, both in attending visitations and in completing the psychological evaluation. While we acknowledge that appellant's actions may have contributed to this short delay, there is nothing in the record to confirm that mother's claims were true. Before visits were interrupted, the case plan goal continued to be reunification, at least with appellant.
 {¶ 64} Nevertheless, after appellant began visits again in September 2005, the agency had already decided to pursue permanent custody. In light of appellant's previous completion of so many services and assessments, it is illogical to presume that he would not have completed the psychological evaluation had he thought it would have furthered his goal of reunification with his children. After the permanent custody motion was filed, appellant's participation in any services or the completion of the psychological evaluation was clearly unimportant to the agency. When the permanent custody motion was filed in October 2005, however, the children had been in LCCS' temporary custody for only 18 *Page 26 
months. Thus, in order for the court to be able to make a finding under R.C. 2151.414(B)(1)(d), more time had to run.
 {¶ 65} In this case, the hearing on the motion was initially set three months out from the filing of the motion, exactly 22 months from the date the complaint was filed, coincidentally meeting the R.C.2151.414(B)(1)(d) factor. The hearing date was then changed or extended three times in 2006, first to May, then to early July, and finally to late July, ensuring that by the time the case came to trial the children had been in the agency's custody for almost 29 months. In our view, the agency was able to establish the requisite time period only because of the lengthy and unnecessary delay while the parties awaited the hearing. Thus, under the facts of this case, we conclude that delays which caused the children to be in custody for 12 months out of 22 consecutive months were not due to appellant's lack of efforts or diligence but were artificially created and do not establish the requisite criteria under R.C. 2151.414(B)(1)(d).
 {¶ 66} Therefore, we conclude that the trial court's findings which form the basis to grant permanent custody to LCCS are not supported by the evidence and testimony presented. Accordingly, appellant's sole assignment of error is well-taken.
 {¶ 67} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed and remanded for proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for *Page 27 
the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J. William J. Skow, J. Concur.
[1] Mother's parental rights were also terminated by the trial court, but she is not a party in the instant appeal. Thus, we will address primarily only the allegations, evidence, and testimony as it pertains to appellant. *Page 1