DECISION. *Page 2 
{¶ 1} Appellant Hannah Leavitt appeals from the judgment of the Hamilton County Juvenile Court terminating her parental rights and granting permanent custody of her two minor children, Nathan Shepard and Draco Lane, to the Hamilton County Department of Job and Family Services ("HCJFS").
 I. Facts and Procedural History {¶ 2} Leavitt's oldest son, Nathan, was born on March 15, 2003.[1]
HCJFS first began working with Leavitt and her mother, Sandra Shepard, in 2004 to address the cleanliness of their home and basic parenting skills. In June 2004, a caseworker took photographs of their home that showed animal feces covering the floors and garbage and clutter everywhere. In February 2005, a family aide responded to the home and found Nathan crawling on the floor with a cigarette butt in his mouth. His clothes and body were dirty. The aide reported a foul smell in the home, which was littered with animal feces, trash, and debris.
 {¶ 3} In March 2005, HCJFS received a report of physical abuse involving Nathan. Nathan was then removed from the home and placed in foster care through HCJFS, pursuant to a voluntary-care agreement, after Nathan's maternal uncle, George Leavitt, who was residing in the home because he needed a telephone line for his EMU monitoring unit through the criminal courts, admitted that he had struck Nathan in the face and head several times. HCJFS also presented testimony that the home had continued to remain unclean and in a deplorable condition. *Page 3 
 {¶ 4} During the first several months of court involvement, Leavitt and Shepard complied with court-ordered services and were able to begin unsupervised visitation with Nathan in their home. But in January 2006, the conditions in their home began to deteriorate again. An early-intervention specialist, who had visited the home to work with Nathan and Leavitt together, reported that cigarette butts were littering the floor and that the home appeared to be unsanitary. The specialist also reported that neither Leavitt nor Shepard was present, and that an unidentified male was residing in the home with Nathan. As a result, HCJFS filed a case-plan amendment to revoke Leavitt's weekend visits and to revert to supervised visits at the agency.
 {¶ 5} On February 19, 2006, Leavitt gave birth to Draco at home. He was delivered by Shepard. HCJFS was unaware of the pregnancy until February 21, 2006, when Leavitt and Shepard took the child to Good Samaritan Hospital. The hospital reported serious concerns about both Leavitt's and Shepard's hygiene. Leavitt signed a voluntary agreement for Draco's care on February 21, 2006.
 {¶ 6} On February 24, 2006, the court granted interim custody of Draco to HCJFS, as well as an extension of temporary custody for Nathan. At that time, HCJFS requested that both Leavitt and Draco's father, Michael Lane, who had been living in the home with Leavitt and her mother, complete psychological assessments. HCJFS also asked Lane to complete a sexual-offender diagnostic assessment.
 {¶ 7} On March 3, 2006, an HCJFS caseworker and a guardian ad litem made a visit to Leavitt and her mother's home to assess the conditions there. The home contained overflowing ashtrays. Steak knives and cigarette butts were strewn over the floor. Leavitt's room was likewise littered with cigarette butts, and Nathan's *Page 4 
crib was very soiled. Shepard would not allow the HCJFS caseworker or the guardian ad litem to enter her room. Due to these unsanitary conditions, Leavitt was unable to resume visitations in her home.
 {¶ 8} In April 2006, Leavitt and Lane reported to the court that they had moved to Indiana. They also expressed their intention to give legal custody of both children to a George Raymond Rahar, a maternal uncle in Illinois. HCJFS began an interstate investigation of the maternal uncle. As part of its investigation, HCJFS reviewed the children's services record of Leavitt's mother.
 {¶ 9} The record revealed that Leavitt had suffered horrific sexual abuse as a child on multiple occasions while in her mother's care and that her mother had a significant history with children's services in at least three different states. Moreover, HCJFS had substantiated an allegation of sexual abuse made by Leavitt against Rahar, the same brother whom Leavitt had proposed as a potential legal custodian for both Nathan and Draco.
 {¶ 10} On June 9, 2006, the trial court adjudicated Draco a dependent child and placed him in the temporary custody of HCJFS. The court noted that Leavitt and Lane had returned to Cincinnati, but that they were still interested in Rahar as a potential legal custodian for both boys.
 {¶ 11} Throughout this case, both Leavitt and Lane visited sporadically with the children, due to their lack of contact with HCJFS and severe hygiene issues. Leavitt and Lane arrived at HCJFS on multiple occasions with severe head lice and nits, which caused their visits with Nathan and Draco to be cancelled. During the supervised visitation, Leavitt interacted very little with the children, and the children showed very little attachment to her. *Page 5 
 {¶ 12} In November 2006, HCJFS moved to modify temporary custody of both Nathan and Draco to permanent custody. A three-day trial was held in August 2007 before a magistrate. In September 2007, the magistrate granted HCJFS's motion for permanent custody. Leavitt filed timely objections to the magistrate's decision. In February 2008, the trial court journalized an entry overruling Leavitt's objections and adopting the magistrate's decision.
 II. Weight of the Evidence {¶ 13} In her first assignment of error, Leavitt contends that the juvenile court's judgment awarding permanent custody of her children to HCJFS was contrary to the manifest weight of the evidence.
 {¶ 14} To terminate Leavitt's parental rights, HCJFS had to prove by clear and convincing evidence one of the four factors enumerated in R.C.2151.414(B), and that the children's best interest would be served by a grant of permanent custody to the agency.[2] Clear and convincing evidence is that which produces in the mind of the trier of fact "a firm belief or conviction as to the facts sought to be established."[3]
 {¶ 15} HCJFS moved for permanent custody of Leavitt's children pursuant to R.C. 2151.414(B)(1)(a). Under that statute, the trial court was required to find that the children could not be placed with Leavitt within a reasonable time or should not have been placed with her, based upon an analysis of the factors in R.C. 2151.414(E). The trial court was also required to find that granting permanent custody to HCJFS was in the best interests of the children based upon an analysis of the factors in R.C. 2151.414(D).[4] *Page 6 
 {¶ 16} Leavitt, however, challenges only the juvenile court's findings under R.C. 2151.414(E). The juvenile court, relying upon the factors in R.C. 2151.414(E)(1) and (E)(4), concluded that Leavitt's children could not be placed with her within a reasonable time, and should not be placed with her, due to her failure to substantially remedy the conditions that had originally caused the children to be placed outside her home, and because she had demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with them when she was able to do so.
 {¶ 17} Leavitt first contends that the trial court's finding under R.C. 2151.414(E)(1) was not supported by the weight of the evidence. She argues that HCJFS failed to prove by clear and convincing evidence that she had failed to substantially remedy the conditions that had caused the children to be removed from her home, and that HCJFS had failed to show that it had made reasonable efforts to assist her in completing the case plan.
 {¶ 18} The record reveals, however, that HCJFS had worked with Leavitt and her mother since 2004 on both a formal and an informal basis to address concerns about their home's poor conditions and their hygiene issues. A HCJFS caseworker testified that she had made a family-aide referral for Leavitt in March 2006 to assist Leavitt in cleaning her home and in training her on how to clean her home. Leavitt, however, moved to Indiana and did not utilize the service. The record also reveals that HCJFS had provided other aides to the family in the past to address issues of cleanliness. Leavitt, however, was unable to consistently keep the home in a sanitary condition. An HCJFS caseworker testified that she had visited the home as late as April and August 2007, and that the home remained cluttered, unclean, and *Page 7 
hazardous to children. Given these circumstances, we cannot say that the juvenile court's finding under R.C. 2151.414(E)(1) was against the manifest weight of the evidence.
 {¶ 19} Leavitt also argues that the juvenile court's finding under R.C. 2151.414(E)(4) was not supported by the manifest weight of the evidence. She relies upon In re Heaven G., where the Sixth Appellate District reversed a grant of permanent custody in part based on the fact that a number of findings made by the juvenile court, including a finding under R.C. 2151.414(E)(4), were not supported by the record.[5] In that case, the appellate court held that because a father had visited his children consistently over a two-year period, with the exception of a two-month period when he had feared being arrested on an open warrant, that two-month absence was insufficient to support a finding under R.C. 2151.414(E)(4), particularly when he had been working full-time, paying child support, and living in a home that was large enough to accommodate himself and his children.[6]
 {¶ 20} Leavitt's case is factually distinguishable from In re HeavenG because the record in this case reveals that the visitation between Leavitt and her children was much more sporadic. Between January 2007 and July 2007, Leavitt did not visit the children due to problems with her hygiene. Testimony from numerous HCJFS case aides revealed that HCJFS had addressed the problem of personal hygiene with Leavitt on multiple occasions to no avail. Leavitt also missed a significant amount of visits in 2006 due to her move to Indiana. She additionally failed to notify HCJFS that she would be unable to attend visitation, causing the trial court to order that she provide HCJFS with 24 hours' notice concerning whether she would be able to attend *Page 8 
visitation. Despite that provision, Leavitt often failed to contact HCJFS regarding visitation. Furthermore, there was testimony that, during the supervised visitation, Leavitt interacted very little with the children; that the children showed very little attachment to her; and that Leavitt was completely dependent upon her mother for housing, transportation, and income. Consequently, the record supports the trial court's finding that she did not regularly support, visit, or contact the children.
 {¶ 21} Based upon the foregoing and our review of the entire record, we hold that the trial court did not err in awarding permanent custody of Leavitt's children to HCJFS. We, therefore, overrule her first assignment of error.
 III. Adoptive Case Plan {¶ 22} In her second assignment of error, Leavitt contends that the juvenile court erred as a matter of law when it granted HCJFS's motion for permanent custody without an adoptive case plan. She relies uponIn re T.R., a recent decision where the Second Appellate District reversed a grant of permanent custody to the Montgomery County Children's Services Board based upon the board's failure to prepare a plan for adoption prior to the trial court's grant of permanent custody.[7] The court noted that R.C. 2151.413(E) requires an agency to include a case plan for adoption with its motion for permanent custody. The court then reasoned that because the "paramount issue" to determine in the hearing on the motion for permanent custody was whether "it [wa]s in the best interest of the child to grant permanent custody to the agency that filed the motion" and because the purpose of the adoptive case plan "[wa]s to allow the court to consider the child's prospects for adoption if the motion [were] granted, which [wa]s a matter that directly relate[d] to *Page 9 
the best interest of the child at issue,"[8] it would "defy logic" to allow the agency to defer filing the adoption case plan until after permanent custody had been ordered.[9] In reaching this conclusion, the court acknowledged that it was in conflict with the Fifth, [10]
Eleventh, [11] and Twelfth Appellate Districts.[12] The Ohio Supreme Court, recognizing the conflict on the issue, has accepted the case for review.[13]
 {¶ 23} Before addressing Leavitt's argument, we note that Leavitt failed to raise this issue in the trial court. She has, therefore, waived the issue for appellate review.[14] As a result, we review the trial court's actions only for plain error.[15]
 {¶ 24} Leavitt maintains that HCJFS's failure to file an adoptive case plan prior to the grant of permanent custody rose to the level of plain error, urging us to adopt the Second Appellate District's position. We decline to do so. Rather, we agree with those districts that have held that R.C. 2151.413(E) does not require an adoptive case plan to be filed before permanent custody is granted because (1) the agency cannot know whether adoption is a viable option before permanent custody is granted; (2) such a requirement would undermine the agency's reunification efforts and cause additional work that might be rendered moot if permanent custody were denied; and (3) requiring a court to dismiss a motion for permanent custody when an agency has not filed an adoption plan effectively places procedure over the child's best interests.[16]
Because we find the Fifth, Eleventh, and Twelfth Appellate District's interpretation of R.C. 2151.413(E) to be more tenable than that advanced by the *Page 10 
Second Appellate District, we overrule Leavitt's second assignment of error and affirm the judgment of the juvenile court.
Judgment affirmed.
PAINTER and HENDON, JJ., concur.
[1] David Dale, the alleged father of Nathan, has never contacted, visited, or supported Nathan in any way, nor was he a part of the proceedings in the trial court.
[2] See R.C. 2151.414(B)(1).
[3] Cross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.
[4] See In re D.A., 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, at ¶ 12-18.
[5] 6th Dist. No. L-06-1362, 2007-Ohio-3313 at ¶ 53-57.
[6] Id.
[7] 2nd Dist. No. 22291, 2007-Ohio-6593, at ¶ 11-29.
[8] Id. at ¶ 27.
[9] Id.
[10] In re McCutchen (Mar. 8, 1991), 5th Dist. No. 90-CA-25.
[11] In re Gordon, 11th Dist. No. 2002-T-0073, 2002-Ohio-4959.
[12] In re Cavendar (Mar. 19, 2001), 12th Dist. No. CA2000-06-037.
[13] See In re T.R., 117 Ohio St.3d 1456, 2008-Ohio-1635.
[14] See Juv.R. 40(E)(3)(d).
[15] In re Etter (1998), 134 Ohio App.3d 484, 491-492,731 N.E.2d 694.
[16] Cavendar, supra. *Page 1