DECISION AND JUDGMENT ENTRY
{¶ 1} Appellants, Beverly C. and Joshua C. Sr., appeal the judgment of the Lucas County Court of Common Pleas, Juvenile Division, which awarded appellee, the Lucas County Children Services Board ("LCCS") permanent custody of their three children, Joshua Jr., Stephanie, and Michael.
 {¶ 2} Appellants and their two older children, Joshua Jr. and Stephanie, then aged two and one, respectively, were evicted from the Motel 6 where they had been staying, because they were unable to pay. Their previous home had been condemned and they *Page 2 
were forced to move. On May 7, 2004, LCCS petitioned for and was granted emergency temporary custody. On May 10, 2004, LCCS filed a complaint alleging dependency and neglect. The complaint alleged that appellants lacked money to pay for housing; that both appellants "appear to be low functioning"; that both appellants underwent diagnostic assessments, were recommended counseling, and failed to follow through; that a psychiatric evaluation was recommended for Beverly; that LCCS had "attempted to assist the family by providing * * * protective day care," and that appellants had not used the service.
 {¶ 3} On May 25, 2004, LCCS filed a case plan for reunification which listed goals and services to enable appellants to be reunited with their children. In the section labeled "Circumstances regarding removing child from home" it stated, "Family has no stable housing. The needs of the children are not being met." The goals and services included (1) obtaining and maintaining stable housing, (2) attending parenting classes, (3) exercising good budgeting skills with the help of a community advocate, (4) a drug and alcohol abuse assessment and random urine screens for Joshua Sr. due to his admission of smoking marijuana, and (5) mental health assessments and counseling. The plan provided appellants visitation with the children once a week.
 {¶ 4} On July 7, 2004, the guardian ad litem ("GAL") assigned to the children filed a report. She observed appellants interact with the children during a visitation and reported that "both parents obviously love their children very much. The parents were very caring with their children and acted appropriately. The children showed affection to *Page 3 
both parents and listened to them very well." The GAL visited the home which appellants rented on July 6, 2004, and found the home clean. She recommended reunification of the children with appellants within a short time and that the visitation should "increase in frequency and possibly be rescheduled to weekends to avoid interference with employment."
 {¶ 5} On July 7, 2004, a hearing on the dependency and neglect complaint was held and appellants consented to a finding of dependency. No evidence to support the allegations of the complaint appears in the record. The court also approved the filed case plan and in its order, the court amended the case plan by increasing visitation to twice per week.
 {¶ 6} In December 2004, appellants were evicted from their home for failure to pay rent. A community advocate working with appellants reported their difficulties in maintaining employment.
 {¶ 7} A case plan review deleted the substance abuse services and case plan goal for Joshua Sr. stating "no current concerns for drug usage, issue resolved." Joshua Sr. had been following the recommendation of submitting to urine screening since December 2003. Notes state that "Joshua continues to leave negative urine screens. He states he has not used any substances in approx. [sic] one year." Both Joshua Sr. and Beverly began counseling, but were attending only sporadically; however, the case plan also notes that a "coping skills group" which Beverly was supposed to attend conflicted with visitation with the children. *Page 4 
 {¶ 8} In January 2005, Joshua Sr. was charged with and subsequently convicted of domestic violence, perpetrated against Beverly. He was incarcerated for 30 days and was ordered to undergo urine screening for drugs as part of his probation. In March 2005, LCCS filed a modified case plan which required Joshua Sr. to attend domestic violence offender's counseling and required Beverly to attend a domestic violence survivor's group.
 {¶ 9} On May 20, 2005, LCCS filed its motion for permanent custody of Joshua Jr. and Stephanie. It alleged that appellants were being evicted again and that both appellants were unemployed and without income. It also referenced the January 2005 incident of domestic violence.
 {¶ 10} Appellants obtained independent housing in October 2005. On February 8, 2006, Michael was born. LCCS filed a complaint in dependency and a motion for original permanent custody of Michael and took Michael into protective custody immediately after his birth. This complaint was subsequently consolidated with the pending motion for permanent custody of Joshua Jr. and Stephanie.
 {¶ 11} On May 1, 2006, Michael's adjudication hearing was held. Jason Wegman, a parenting instructor for LCCS parenting classes, testified for LCCS. The parenting classes were held from March 29, 2004, to July 1, 2004, — two years before the hearing. The parenting classes spanned the period of appellants' transience, hotel stays, and their eviction from a motel on May 7, 2004. *Page 5 
 {¶ 12} Appellants had attended each and every parenting class for the 12 week course, despite their transience. After Joshua Jr. and Stephanie were removed from appellants' care, Wegman observed appellants interact with their children weekly. Although appellants attended every session, Wegman did not certify their completion as "successful." He described Joshua Sr.'s involvement in the classes as "minimal" and opined that he and the children were not bonded and he lacked patience. He said that Beverly didn't make "a sufficient amount of progress." He testified that extended parenting had been offered and initiated, but was "pulled" because of a lack of housing stability and instability in their relationship. He said that if reunification occurred, then extended parenting support in the home would be available.
 {¶ 13} Next, Dr. Charlene Cassel, a psychologist for Harbor Behavior Health, testified to her assessment of Beverly. On March 14 and April 11, 2005 — over a year prior to the hearing — she had conducted two clinical interviews, personality testing, intelligence testing, and "parenting testing." She did not observe Beverly interact with her children. She concluded that Beverly's I.Q. of 78 placed her in the "borderline range"; that Beverly denies the need to change or learn in order to solve problems; that Beverly finds parenting stressful and unrewarding. She opined that Beverly's ability to change in response to problems was low and that Beverly had already taken all of the treatment that she would have recommended. She did not diagnose Beverly with any psychiatric or emotional condition, and expressed no opinion on Beverly's ability to parent her children. *Page 6 
 {¶ 14} Orasteene Pettaway, a LCCS community advocate, worked with appellants during two periods, for three months beginning in September 2003 and for five months beginning in September 2004. Both periods involved Pettaway assisting appellants with transportation to medical appointments for the children, helping them obtain housing and implementing budgeting skills. Of the first period, Pettaway testified that appellants accomplished all their (unspecified) goals, except for "clearing up warrants," which interfered with obtaining low-income housing.[1] Of the second period, Pettaway again testified that "goals" were unaccomplished due to outstanding warrants and the resultant inability to obtain low-income housing. Her only involvement and assistance with the warrants was to transport appellants to court. She did not know what the warrants were for. She testified that both Joshua Sr. and Beverly were cooperative, went to all counseling appointments and medical appointments for the children, looked for housing with her, and were cooperative.
 {¶ 15} Houda Abdoney, a LCCS caseworker, worked with appellants from January 2006 to May 2006. Sarah Crider, another LCCS caseworker, had the case before her. Abdoney testified that appellants had maintained the same home for the previous seven months, since October 2005. She testified that the agency sought original permanent custody of Michael because there was no heat in appellants' home during her visit in January 2006, the month before Michael was born. However, she conducted a *Page 7 
home visit the week prior to the hearing, and found the house adequate, with the heat on and adequate food.
 {¶ 16} With respect to appellants' counseling for domestic violence, she noted that Beverly had attended several group sessions at Harbor, but that Joshua Sr. had not started any classes. Joshua Sr. told her that he could not afford the fees for the classes, which were $35 per session. The revised case plan required him to attend weekly sessions. It also required an up front fee; estimates of the fee ranged from $300 to $400. Per their policy of paying only for victim's counseling and not offender's counseling, LCCS did not offer Joshua Sr. any money to attend the program. Abdoney opined that Joshua Sr. could afford the fees, because she verified that his weekly take-home pay from his full-time job averaged $130. She did acknowledge that Joshua voluntarily attended an anger management course. To her knowledge, no domestic violence had occurred since January 2005, 16 months prior.
 {¶ 17} The GAL filed a new report, which was not mentioned or discussed at the adjudication hearing. She reported that appellants had kept the same house for eight months, since October 2005, and that their rent and utilities were current. The rent was $500 per month and the only extra utility payment required was propane for heat. She found the home appropriate for the children, and reported that both Joshua Sr. and Beverly had maintained the same employment for over one year.
 {¶ 18} Interestingly, the GAL also reported that Joshua Sr. stopped counseling because his therapist notified LCCS that he would no longer accept their clients as *Page 8 
patients. Joshua Sr. was told he would be referred to a new therapist and "much time passed without assistance from the caseworker. * * * The referral never occurred until a new caseworker was assigned." In her conclusions, she pointedly noted, "It is important to note that some of the delay with [Joshua Sr.] completing his counseling was due to the caseworker, Sarah Crider." She concluded that "the initial concerns at the time of removal have been mostly resolved. The parents have maintained steady employment for over one year. The housing has been stable since October. There was a problem with the heat and a new furnace has been installed. It was installed after Michael was born." She ultimately recommended: "It is not in the best interest of the children to have the parental rights of Beverly and Joshua terminated. The parents have substantially corrected the initial cause for removal and the children could be returned in a short time."
 {¶ 19} The trial court immediately announced a finding that Michael was a dependent child and continued the matter for the permanent custody hearing.
 {¶ 20} A case plan review dated June 5, 2006, reported that Joshua Sr. had not yet started a domestic violence program; Joshua Sr. reported to his caseworker that he first had to pay the fines for his domestic violence conviction, which were between $400 and $588, within two months or else a suspended term of incarceration would be imposed. The caseworker had Joshua Sr. sign a release to get the results of his urine screens from his probation officer. The GAL reported to the caseworker that appellants had completed a budget plan. Both appellants were working full-time at positions they had held for over a year. The review shows that visitation was still scheduled for only once a week, despite *Page 9 
the July, 2004 order that visitation be increased to twice per week and despite the GAL's repeated recommendation of increasing visitation.
 {¶ 21} On September 26, 2006, the permanent custody hearing was held. Wegman, the parenting instructor, reiterated his testimony regarding the parenting classes from March 2004 to July 2004. Dr. Cassel, the psychologist, repeated her testimony regarding her April 2005 psychological evaluation of Beverly. Pettaway, the community advocate, repeated her testimony regarding her September 2004 through December 2004 involvement.
 {¶ 22} Sarah Crider, an LCCS caseworker, testified that she worked with appellants from August, 2003 to December, 2005 — a period ending nine months prior to the hearing. She testified to the domestic violence incident in January, 2005 — 20 months before the hearing. She acknowledged that the initial concerns which caused the children to be removed from appellants' care involved obtaining and maintaining appropriate, stable housing, participation in parenting groups, budgeting, substance abuse assessments, and diagnostic assessments. She admitted that, with the exception of the domestic violence counseling, appellants had done everything they were required to do. Domestic violence had not been a concern until after the January 2005 incident. She admitted that Joshua Sr. could not afford the domestic violence offender treatment while she was the caseworker.
 {¶ 23} She testified that appellants' budget when the children were in their care was $900 per month from social security and welfare and $400 per month in food stamps. *Page 10 
After the children were removed, their welfare benefits were cut. Once they were working, Beverly earned $200 to $300 per week and Joshua Sr. earned approximately $200 per week. These were the same full-time jobs that appellants had kept since May 2005, and the same jobs to which Abdoney, the caseworker subsequent to Crider, said earned Joshua Sr. only $130 per week in take-home pay.
 {¶ 24} With respect to visitation, she stated Beverly visited regularly, but Joshua Sr. "may not just show up," because he had to work. She admitted that his visitation hours conflicted with his full-time employment during the day. She also admitted she did not tell Joshua Sr. that arrangements could be made to schedule visitation to not conflict with his work schedule. She had no idea how many times Joshua Sr. had missed visitation.
 {¶ 25} With respect to drug abuse concerns, she testified that Beverly always cooperated with urine screening requests and that the results were always negative. She acknowledged that Joshua Sr. did not have any positive urine screens during her stint as caseworker.
 {¶ 26} She opined that LCCS pursued permanent custody because appellants showed a lack of consistency and dedication with "getting their services done" so reunification could occur. She admitted that, having observed appellants visit with the two older children, they were bonded.
 {¶ 27} Houda Abdoney, appellants' caseworker from January 2006, to May 2006, testified to essentially the same matters to which she testified at Michael's adjudication in *Page 11 
May 2006. She added that appellants were always cooperative with her, she saw no evidence of them getting evicted, and with the exception of January 2006, appellants' household bills were current and they maintained employment. She saw proof of Joshua Sr.'s voluntary completion of the anger management course. In contradiction to her testimony at adjudication, she said Joshua Sr.'s domestic violence counseling fees would include an initial fee of $100 and then $30 per weekly session; she reiterated her opinion that Joshua Sr. should be able to afford it since his take home pay from full-time employment averaged $130 per week. She did not request Beverly's pay stubs. She also added that appellants still experienced conflict in their relationship due to concerns that Joshua Sr. was not Michael's biological father. Beverly had maintained that he was, but Joshua Sr. had doubts.
 {¶ 28} Emily Costell, a LCCS caseworker who took appellants' case in May 2006, after Abdoney, testified to more recent events. On September 6, 2006, a few weeks before the hearing, Beverly called and reported that she had been attacked in her garage by "an unknown assailant." Beverly went to the hospital and received an injection for pain from bruising on her back and neck. A few days later, Beverly admitted to Costell that she had lied, and that Joshua Sr. was the perpetrator. No police report was filed. Beverly explained to Costell that she "didn't want anything else stopping her children from coming home." Costell did not add any new case plan services; she told Beverly to keep attending her victim's class and to call 911 to report any new incidents. *Page 12 
 {¶ 29} Costell acknowledged that the only case plan services which appellants had yet to complete was domestic violence counseling. At the time of the hearing, Beverly had nearly completed her class. She reviewed the rest of the most recent case plan and admitted that Beverly had completed all other objectives required of her. She observed two visitations between Beverly and the children and thought they were bonded.
 {¶ 30} One marked difference between Costell's investigation and the other caseworkers' was Beverly's urine screens. She asked Beverly to give five urine screens; one of those tests was positive for opiates and the others were positive for barbiturates. She did not explain why, despite to prior concerns of Beverly's substance abuse, she asked for the screens. Beverly explained to Costell that she was taking medication for migraines and gave Costell a list of medications. Costell acknowledged that the medication was in a class of barbiturates, but said that the laboratory reported the medication would not cause a positive test. No evidence of the positive urine screens, aside from her testimony, appears in the record. No case plan services were added to address the issue and help Beverly. No mention of the positive urine screens appears in the judgment entry and the trial court did not rely on them in its consideration of the statutory factors for termination.
 {¶ 31} With respect to Joshua Sr., Costell acknowledged that the urine screens Joshua Sr. completed for his probation officer were all negative. She said that he had visited with the children regularly, but had not visited for the past three weeks before the *Page 13 
hearing. She acknowledged that he works full-time during the day and that visitation conflicted with his work schedule.
 {¶ 32} LCCS then rested, and Beverly called Jim Thompson, a domestic violence program manager at Harbor and the counselor who had worked with Beverly the previous two months. He testified that Beverly had attended six sessions and had two more before the class was complete. He said she had disclosed to him the incident from early September, but he did not "pressure" her for details. He said he wouldn't recommend further sessions or referrals for Beverly, and said she understood the sessions and has demonstrated she can act on the information. On cross-examination, he admitted it would be "a concern" if a victim continued to reside with a perpetrator; however, he said that was frequently the case and that victims were often fearful. He discussed "safety plans" with Beverly — a plan for whom to contact for help and a plan to be ready to leave the perpetrator.
 {¶ 33} Beverly testified to her involvement with Joshua Jr.'s and Stephanie's special needs and medical appointments; her full-time employment since May 2005; and her monthly bills and budgeting. Regarding the recent September incident of domestic violence, she said, "I didn't want to say anything because I want my kids home." She said she initially didn't tell LCCS because she "didn't want anybody to find out because I want my kids home." When asked how she would guarantee her children's safety if they were returned, she said Joshua Sr. and she had agreed that they would not argue or fight in front of the children; if necessary, she would leave Joshua Sr. and take the children with *Page 14 
her. Regarding "conflict" between her and Joshua Sr. over whether he was the biological father of Michael, she testified that she asked Abdoney, the caseworker, for a paternity test to prove it to Joshua Sr. She was told LCCS would not pay for it unless it was court-ordered. She repeatedly denied being afraid of Joshua Sr. and asserted repeatedly that the home was safe for the children.
 {¶ 34} Regarding Joshua Sr.'s visitation with the children, she explained that he worked at least 40 hours per week and it conflicted with the visitation schedule; she said Abdoney, the caseworker, told her that "if he made it twice a month it would be good if he could." Appellants' current combined monthly income from their full-time employment ranged from $900 to $1,100 per month; Beverly said this has lasted since October, 2005.
 {¶ 35} On the day of the permanent custody hearing, four months after the GAL filed her report recommending the children be reunited with appellants, the GAL filed a supplemental report. She observed Beverly's visitation with all three children, and reported that all three were "happy and content" with Beverly during the visit. She also discussed the recent domestic violence incident with Beverly; Beverly explained to her that she had initially lied about Joshua Sr. being the perpetrator because she was afraid it would cause her to "lose" her children. Beverly reported considering leaving Joshua Sr. as she felt it would better her chances of keeping her children. The GAL also expressed concerns that Beverly had lied about the recent urine screen which was positive for *Page 15 
barbiturates. Both appellants were continuing to work full-time and live in the same home.
 {¶ 36} In this supplemental report, the GAL reversed her earlier position that it was not in the best interests of the children to have appellants' parental rights terminated, because appellants had now "not substantially corrected the initial cause for removal and the children cannot be returned to the parents in the near future." She noted that the foster parents have bonded with the children and wished to adopt.
 {¶ 37} At the conclusion of the permanent custody hearing, the trial court immediately pronounced it in the children's best interest to be placed in the permanent custody of LCCS for adoption. In its judgment entry, the court concluded that clear and convincing evidence supported a determination that the children "cannot and should not, be placed with either parent within a reasonable period of time" pursuant to R.C.2151.414(E)(1), (2), (4), (14), and (16) and that an award of permanent custody was in their best interests.
 {¶ 38} From that judgment, appellants timely appealed and have assigned two errors for review:
 {¶ 39} "I. The trial court erred in finding that the Lucas County Children Services Board had made a reasonable effort to reunify the minor children with appellants.
 {¶ 40} "II. The trial court erred in granting Lucas County Children Services Board's motion for permanent custody as it was against the manifest weight of the evidence to grant it." *Page 16 
 {¶ 41} We address the assigned errors jointly for ease of analysis.
 {¶ 42} "In Troxel v. Granville (2000), 530 U.S. 57, 65, the United States Supreme Court noted that parents' interest in the care, custody, and control of their children `is perhaps the oldest of the fundamental liberty interests recognized by this Court.' The protection of the family unit has long been a paramount concern of the courts, as indicated in Stanley v. Illinois (1972), 405 U.S. 645, 651:
 {¶ 43} "The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed `essential,' Meyer v. Nebraska, 262 U.S. 390, 399, (1923), `basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541, (1942), and `[r]ights far more precious * * * than property rights,' May v.Anderson, 345 U.S. 528, 533. `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166, (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra,262 U.S. at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S. at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, (1965) (Goldberg, J., concurring).
 {¶ 44} "We note that this court has long held that `parents who are suitable persons have a "paramount" right to the custody of their minor children. In re Perales (1977), 52 Ohio St.2d 89, 97; Clark v.Bayer (1877), 32 Ohio St. 299, 310,' In re Murray (1990), *Page 17 52 Ohio St.3d 155, 157, and that "[permanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' In re Smith (1991), 77 Ohio App.3d 1, 16. Therefore, parents `must be afforded every procedural and substantive protection the law allows.' Id." In re Hayes (1997), 79 Ohio St.3d 46, 48." In reD.A., 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 8-10.
 {¶ 45} "The law does not contemplate the taking of children from their parents because they can be better provided for by foster parents or adoptive parents due to greater affluency. In re Konneker (1929), 30 Ohio App. 502, 511. Neither does the law contemplate taking children from their parents because they will be more intellectually stimulated in another environment. If this were so, then thousands of families would be broken up whenever it is demonstrated that their children would be either financially or intellectually better provided for in other homes. Only where there is demonstrated an incapacity on the part of the parent to provide adequate parental care, not better parental care, should parents be deprived of custody. In re Konneker, supra." In reLay (1987), 43 Ohio App.3d 78, 82.
 {¶ 46} Thus, a finding of inadequate parental care, supported by clear and convincing evidence, is a necessary predicate to terminating parental rights. "Before any court may consider whether a child's best interests may be served by permanent removal from his or her family, there must be first a demonstration that the parents are `unfit.'"In re Stacey S. (1999), 136 Ohio App.3d 503, 516, citing Quillon v.Walcott (1978), 434 U.S. 246, 255. Parental unfitness is demonstrated by evidence sufficient to support *Page 18 
findings pursuant to R.C. 2151.414. See In re William S. (1996),75 Ohio St.3d 95, syllabus. That statute provides that a parent's rights may not be terminated unless the court finds evidence that 1) the child, "* * * cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," R.C. 2151.414(B)(2), and 2) that a grant of permanent custody of a child to a children's service agency is in the child's best interests. R.C. 2151.414(B)(1).
 {¶ 47} To establish the first prong, a court must determine by clear and convincing evidence that one of the sixteen statutory factors of R.C. 2151.414(E) exists. In appellant's case, the trial court found applicable the factors of R.C. 2151.414(E)(1), (2), (4), (14), and (16). Those sections state in material part:
 {¶ 48} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 49} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the *Page 19 
parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 50} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 of the Revised Code;
 {¶ 51} "* * *;
 {¶ 52} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 53} "* * *; *Page 20 
 {¶ 54} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 {¶ 55} "* * *;
 {¶ 56} "(16) Any other factor the court considers relevant." R.C.2151.414(E)(1), (2), (4), (14), (16).
 {¶ 57} In determining the best interests of the child, a court must consider the statutory factors of R.C. 2151.414(D)(1)-(5):
 {¶ 58} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 59} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 60} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 61} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; *Page 21 
 {¶ 62} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 63} In order to grant permanent custody to LCCS, all of the court's findings must be supported by clear and convincing evidence. R.C.2151.414(E). A decision to award permanent custody may not be overturned "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." In re Alexis K., 160 Ohio App.3d 32, 40, 2005-Ohio-1380, ¶ 26, citing In re Forrest S. (1995), 102 Ohio App.3d 338, 345;Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 64} After thoroughly reviewing the record in this matter, we conclude that the record only supports a single finding that the children should not be reunited with appellants pursuant to R.C.2151.414(B) and (E). The other findings made by the trial court are without basis.
 {¶ 65} First, the record does not contain competent, credible evidence that appellants "failed continually and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home." R.C. 2151.414(E)(1). "The key to a finding pursuant to R.C. 2151.414(E)(1) is whether the parent has substantially remedied the problem or problems which prompted the children's removal from the home." In re Sara H. (Dec. 16, 1994), 6th Dist. No. L-94-116. Caseworker notes, the case plan, and caseworker testimony established that the conditions causing the *Page 22 
children's initial removal from the home were the family's instability in housing and a lack of money to meet the children's needs. At the time of the permanent custody hearing, appellants had stable housing for almost 12 months, had stable, full-time employment for the previous 18 months, and the house was appropriate for children. No one testified that appellants' income would be insufficient to meet their needs. No caseworker testified that the home was inappropriate for the children or that the home lacked food or utilities since January 2006 — nine months prior to the permanent custody hearing. In order to find this factor, the trial court relied on appellants' transience prior to October 2005, ignoring the fact that appellants had maintained stable and appropriate housing since then.[2]
 {¶ 66} Appellee makes much of appellants' "unsuccessful termination" from parenting classes in July, 2004. However, parenting issues did not precipitate removal, and no evidence of neglect was put forth. Moreover, appellants participated in parenting classes before Joshua Jr. and Stephanie were removed. Wegman, the parenting instructor, testified that appellants were experiencing tension between themselves which distracted them from the classes. This is not surprising, since their rented home had been condemned, they were transient, and had such problems with money that they were *Page 23 
evicted from a hotel. Almost any couple experiencing such instability in income and housing would be distracted and "experience tension" with each other. Despite their monetary instability, they attended all parenting classes. The GAL reported on July 1, 2004, during the period of parenting classes, that appellants were "very caring with their children and acted appropriately. The children showed affection to both parents and listened to them very well." No testimony or evidence showed that the children's special needs and mild developmental delays were caused by neglect or poor parenting.
 {¶ 67} Second, the record completely fails to support a finding pursuant to R.C. 2151.414(E)(2). The trial court's judgment entry found that "the mother's chronic emotional illness is so severe that it makes the parent unable to provide an adequate and permanent home * * *." Simply no evidence was put forth that Beverly had a "chronic emotional illness." The psychologist who testified never diagnosed her with an emotional illness. Moreover, the psychologist — whose evaluation was done almost 18 months prior to the permanent custody hearing — never opined as to Beverly's ability to parent her children or provide an adequate home. "Absent testimony that appellant's condition was chronic or severe and without an offered opinion that appellant could not provide an adequate home within a year, an R.C. 2151.414(E)(2) finding is unfounded." In re Alexis K., 160 Ohio App.3d 32, 40, 2005-Ohio-1380, ¶ 44.
 {¶ 68} Third, the trial court found that Joshua Sr. "demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so * * *," a predicate of parental unfitness pursuant to R.C. *Page 24 2151.414(E)(4). "Inability to provide a home does not satisfy the statute." In re Alexis K., supra, ¶ 46. "R.C. 2151.414(E)(4) requires that a failure to support must be so egregious as to demonstrate an unwillingness to provide a home for the child." Matter of Sarah H. (Dec. 16, 1994), 6th Dist. No. L-94-116. No evidence supports this factor, since all testimony indicated that Joshua Sr. regularly visited with his children and only missed a few visits with his children prior to the hearing due to his full-time work schedule.
 {¶ 69} Every caseworker testified that Joshua Sr. visited his children and every caseworker and the GAL said that he was bonded with his children. Every caseworker acknowledged that the visitation scheduled LCCS set up for Joshua Sr. conflicted with his work schedule. One caseworker acknowledged that she did not tell Joshua Sr. that visitation could be changed to accommodate his work schedule. No one could say how many visits with his children he failed to attend — one caseworker guessed three — and no documentary evidence of missed visits was submitted. Even though the consent adjudication of Joshua Jr. and Stephanie amended the case plan to require visitation twice per week, no evidence indicates that this was done and no explanation was given. No child support order was introduced and no one testified that Joshua Sr. failed to support his children. In re Amber L., 6th Dist. Nos. 20230034, 20230035, 20230336, 2005-Ohio-4172, ¶ 74-76.
 {¶ 70} For the same reasons, the finding of R.C. 2151.414(E)(14) is unsupported by the record. No evidence was produced indicating that appellants failed to provide for *Page 25 
their children when they were able to do so. Until October 2005, appellants had unstable housing and employment, which, combined with the alleged difficulties in budgeting what money they did have, rendered them unable to provide a stable home. Unable does not equal "unwilling." All testimony and evidence indicated that the income and housing troubles which led to the children's removal had been remedied. By the time of the permanent custody hearing, appellants' income had been stable for a year and a half and their housing was appropriate for children and had been stable for a year. All caseworkers and the GAL testified that the children and appellants were bonded.
 {¶ 71} Last, R.C. 2151.414(E)(16) remains. This subsection is the "catchall" portion of section (E), which permits a finding that the child cannot or should not be reunited with his or her parents for "any other factor." In re Sean B., 170 Ohio App.3d 557, 2007-Ohio-1 189, ¶ 40. "We have repeatedly held that for a finding under this provision to pass scrutiny, the trial court must ` * * * explain with specificity what the other factor the court deems comparable to one of those enumerated in sections (E)(1) through (15) of R.C. 2151.414.'" Id., quoting In re Delfino L. M, 6th Dist. Nos. L-04-1010 and L-04-1009,2005-Ohio-320, ¶ 23.
 {¶ 72} Articulating its finding for this factor, the trial court stated that "there is ongoing domestic violence in the home between the mother and the father that would be detrimental to the health and safety of the children if they were returned to such an environment." *Page 26 
 {¶ 73} Ongoing domestic violence can be a factor comparable to other R.C. 2151.414(E) subsections which require a finding of parental unfitness. While neither incident occurred when the children were present, as the children were in the temporary custody of the agency, the court could find that, if the children were to be returned, the environment of domestic violence between the parents would detrimentally affect them.
 {¶ 74} We must note, however, some concerns regarding appellee's handling of Joshua Sr.'s domestic violence counseling; these concerns weigh more toward a consideration of appellants' first assignment of error that LCCS failed to make reasonable efforts at reunification. Joshua Sr.'s domestic violence counseling was the sole service in the case plan to complete in order for reunification to occur. All caseworkers testified that LCCS, pursuant to its policy, did nothing to assist Joshua Sr. to be able to afford domestic violence classes. One caseworker admitted that Joshua Sr. could not afford the $100 to $300 up front fee and the $30 weekly per session fees on his full-time take home-pay of $130 per week. Another caseworker thought that he should have been able to pay, despite it costing nearly 25 percent of his take-home salary — money which appellants needed to meet their goals of appropriate, stable housing and reunite the family. Joshua Sr. seemed willing, but unable, to take the course. Yet, LCCS took no steps to help Joshua Sr. engage in domestic violence counseling, and thus, did not provide a "service." However, the numerous other services provided to appellants render appellants' first assignment of error not well-taken, as Joshua Sr.'s counseling was but a fraction of the total services with which appellants were provided. *Page 27 
 {¶ 75} We also confront LCCS's argument that Beverly's initial false report that Joshua Sr. was not the perpetrator of the second incident demonstrates that she is untruthful and has not learned from her counseling. She did, in fact, tell the truth, despite her obvious fear that it would be used against her to remove her children — which is, in fact, what transpired. Despite her fear that reporting abuse would be used against her in a permanent custody proceeding, Beverly did implement what she learned in counseling, only to have her previous statements used against her. The trial court's statement that Beverly "does not appear to be internalizing the information being provided to her" due to the September 2006 incident of violence implies Beverly is to blame for the incident.
 {¶ 76} Recently, we held that no "propensity" for domestic violence exists where one incident of domestic violence occurred after the filing of the complaint and the parent had completed services offered to address the issue. In re Heaven G, 6th Dist. No. L-06-1362,2007-Ohio-3313, ¶ 59. From the beginning of this case in April 2004, until the filing of the complaint, one incident of domestic violence occurred. The motion for permanent custody for the two older children was not filed until nearly five months later. Unlike In re HeavenG., by the time of the hearing, a second incident of domestic violence occurred, and is more troubling.
 {¶ 77} While severe and ongoing domestic violence between the parents is an articulable factor pursuant to R.C. 2151.414(E)(16), the factor must be comparable to the other enumerated factors determining parental unfitness, and LCCS must advance clear and convincing evidence that the factor is comparable to factors demonstrating parental *Page 28 
unfitness. In re Sean B., supra. These facts present a close question on the issue, given that the two incidences occurred nearly 20 months apart and occurred without the children present. However, we cannot say that the trial court erred in its conclusion that, if the children were returned to appellants, the environment of domestic violence would be detrimental. This factor, therefore, was properly applied to appellants' circumstances.
 {¶ 78} All but one of the trial court's findings relative to R.C.2151.414(E) are unsupported by the record. The evidence showed that appellants remedied the problems which caused the children's removal, no evidence exists that Beverly has a "chronic emotional illness," and LCCS has not shown that appellants are unwilling to visit, communicate with, or support their children. Although the issue is close, the evidence supports a finding that domestic violence between appellants exists in a manner equivalent to the other factors of R.C. 2151.414(E). When the court finds one of the enumerated statutory factors, it is required to enter a finding that the child cannot be placed with the parent within a reasonable period of time or should not be placed with the parent. Because the trial court articulated a factor comparable to other statutory factors, and because it is supported by the record, it properly entered a determination that the children cannot and should not be placed with appellants.
 {¶ 79} Before granting permanent custody, however, it must be found that a termination of parental rights is in the child's best interests. A court is required to consider all relevant favors, including, but not limited to, the factors enumerated in R.C. 2151.414(D) and R.C.2151.414(E)(7)-(11). In its judgment entry, the trial court stated *Page 29 
1) that the children were in need of a legally secure permanent placement and that awarding LCCS permanent custody would facilitate adoption, and 2) that the GAL's final report recommended permanent custody as being in the children's best interest.
 {¶ 80} These considerations are sufficient to enter a determination that termination of appellants' parental rights is in the children's best interests. The two considerations stated by the trial court mirror the considerations of R.C. 2151.414(D)(4) and (2), respectively. Since the "best interests" list of considerations is neither exhaustive nor must each consideration be separately articulated in the judgment entry, we cannot say the trial court erred in its determination. In re NicholasA., 6th Dist. No. L-04-1303, 2005-Ohio-2104, ¶ 23; In re Erich L., 6th Dist. No. L-04-1340, 2005-Ohio-2945, ¶ 42; In re Turner, 5th Dist. No. 2006-CA-45, 2006-Ohio-6793, ¶ 34; In re Hershberger Smith, 3d Dist. Nos. 1-04-55, 1-04-61, 2005-Ohio-429; In re G.B., 10th Dist. No. 04AP-1024, 2005-Ohio-3141. But see, contra, In re Smith, 11th Dist. No. 2002-A-0098, 2003-Ohio-800. In sum, clear and convincing evidence supports the required statutory findings, and the trial court did not err in its decision to terminate appellants' parental rights. Appellants' second assignment of error is not well-taken. Appellants' first assignment of error is not well-taken for the reasons stated, infra.
 {¶ 81} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to *Page 30 
App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J., William J. Skow, J., Thomas J. Osowik, J. Concur.
[1] No one ever testified what the warrants were for. The record contains no evidence of them.
[2] Moreover, at the time of Michael's adjudication in May 2006, the GAL found appellants' home to be stable and appropriate. Appellants' home was without heat only in January, 2006. The GAL noted that the furnace was fixed and working after Michael was born. Her report filed May 1, 2006, concluded that the concerns at the time of removal had been mostly resolved and she recommended reunifying the children with appellants in "a short period of time." No note was taken of this report at Michael's adjudication. *Page 1